## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SARA MALDONADO-MORALES,** | : | Civil No.  **1:22-CV-377** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.    Introduction

Sara Maldonado-Morales applied for Social Security benefits on October 25, 2019, alleging that she had become totally disabled beginning on July 1, 2019. However, Maldonado actually was employed, both full and part-time, for some thirteen months after she claimed that she was totally disabled, from July 1, 2019 through August of 2020. Moreover, five out of six medical experts who considered her case concluded that Maldonado could perform some work notwithstanding her impairments.

On these facts, the ALJ denied Maldonado's claim. Maldonado now appeals this decision, arguing that the ALJ erred in assessing her severe and non-severe

impairments, and should have followed the sole medical opinion which supported

her disability claim.

We evaluate this appeal against a highly deferential standard of review, one

which calls upon us to affirm the decision of the ALJ if that decision is supported by

"substantial evidence:"

> [A] "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

Mindful of the fact that substantial evidence, "means only—'such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion,'"

Biestek, 139 S. Ct. at 1154, we find that the ALJ adequately addressed the evidence

in this case when concluding that Maldonado had not met the exacting standard for

demonstrating an entitlement to disability benefits. Further, substantial evidence supported the ALJ's disability determination in this case, denying Maldonado's claim. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II.   <u>Statement of Facts and of the Case</u>

On October 25, 2019, Sara Maldonado-Morales applied for disability and supplemental security income benefits under Titles II and XVI of the Social Security Act, alleging an onset of disability on July 1, 2019.  (Tr. 15). Maldonado was born in 1979, was 40 years old at the time of the alleged onset of her disability, and was defined as a younger worker under the Commissioner's regulations. (Tr. 32). Maldonado had  an eleventh grade education and prior employment as a sales clerk, waitress, and store laborer. (<u>Id</u>.) In this disability application, Maldonado alleged that she was disabled due to obesity, intraventricular meningioma, neurocognitive disorder, degenerative disc disease of the lumbar spine, arthritis of the left ankle joint, and migraine headaches. (Tr. 18).

Maldonado's disability application was highly unusual in at least one significant respect. Although Maldonado alleged that she had become totally disabled on July 1, 2019, it is entirely undisputed that she continued to work both

full-time and part-time for another thirteen months past her alleged date of onset of disability, until August of 2020. (Tr. 17-18).

### A. **Maldonado's Clinical History and Activities of Daily Living**

During the pertinent time period, Maldonado was seen, treated, examined, and assessed by a number of health care providers. Thus, a robust clinical record exists in this case. (Tr. 338-1103). Yet, while this treatment history is extensive, for the most part it is relatively unremarkable and contains scant evidence of wholly disabling impairments.

Maldonado initially reported symptoms of left hand weakness and tingling on July 14, 2019. (Tr. 367-429). Maldonado was hospitalized for three days. (Id.) During this time doctors performed a battery of tests, including a CT examination, which revealed a 3.3 by 1.8 by 2.8 cm intraventricular brain mass. (Tr. 356). This testing disclosed no evidence of acute hemorrhagic or ischemic infarct and by the time of her discharge on July 17, 2019, Maldonado was free from any neurological symptoms. (Tr. 369).

On August 7, 2019, Maldonado underwent an endoscopic procedure and colonoscopy to determine whether there was any metastatic disease present. (Tr. 356-62). These test results were also unremarkable, merely identifying some polyps, diverticulosis, and trivial hemorrhoids. (Tr. 362).

4

On September 24, 2019, Maldonado was seen by Dr. Denyse Allen complaining of headaches and reporting that she was stressed as she awaiting further diagnosis and treatment option for her intraventricular brain mass. (Tr. 455-56). Her physical examination results, however, were unremarkable as she displayed a normal range of motion, mood, affect, and behavior. (Tr. 456).

On October 9, 2019, Dr. Michael Glantz, a neurologist, examined Maldonado. (Tr. 435-37). During this clinical encounter, Maldonado acknowledged her continued employment, telling the doctor that she reduced her hours at Boscov's from 40 to 20-28 hours per week due to her headaches. (Tr. 436). The doctor's physical examination revealed normal strength and sensation on Maldonado's part; her heel-toe and tandem walking were adequate; her intellectual functioning tests demonstrated normal speech and language, and she was able to understand three-step commands and perform simple calculations. (Tr. 436). Dr. Glantz detected no evidence of a stroke  and with respect to her intraventricular brain mass found that, "[t]here has perhaps been a very slight increase in the size of the lesion of the course of [Plaintiff's] three brain MRI scans (7/14/19, 8/8/19, 10/4/19); however, [she] appears at this point to be asymptomatic from her brain lesion and there is no hydrocephalus." (Tr. 437). Dr. Glantz suggested that Maldonado's episodes of left-hand numbness might represent irritation of the median nerve in the carpal tunnel

and recommended that she undergo another brain MRI in two to three months. (Tr. 437).

On October 15, 2019, Dr. Kristine Dziurzynski, M.D., a neurosurgeon, diagnosed Maldonado with an asymptomatic intraventricular meningioma, a non-malignant tumor. (Tr. 451). Maldonado's physical examination revealed no abnormalities and Dr. Dziurzynski simply recommended surveillance of the tumor at three and six months and then annually if stable. (Id.) Ten days later, on October 25, 2019, Maldonado was seen once again by Dr. Allen for bilateral wrist pain and numbness that she believed was carpal tunnel syndrome (Tr. 449). A physical examination at that time revealed a normal range of motion, as well as normal behavior, mood, and affect for Maldonado. (Tr. 449-50). Dr. Allen ordered an EMG/nerve conduction study and prescribed wrist splints for the plaintiff. (Tr. 450).

A November 19, 2019 CT examination revealed that Maldonado's meningioma was stable and unchanged in appearance. (Tr. 468). At that time Maldonado reported chronic migraine headaches but stated that "[s]he has been able to continue working" notwithstanding these symptoms. (Tr. 446).

In January of 2020, Maldonado was seen by Dr. Allen and Dr. Dziurzynski. During her appointment with Dr. Allen, Maldonado continued to display a normal mood, affect, and behavior, but complained of headaches. (Tr. 545-46). In the course

6

of her appointment with Dr. Dziurzynski, the neurosurgeon, Maldonado indicated that she "has been able to continue working." (Tr. 560). Her meningioma was found to be clinically and radiographically stable, and Maldonado was instructed to follow up in nine months, and thereafter annually. (Id.) Likewise, a function report completed by Maldonado in February of 2020 indicated that she retained the ability to work. In fact, Maldonado flatly stated: " I am currently working at Boscov's as a cashier and stocker of luggage, toys candy and garden department." (Tr. 303).

On March 5, 2020, Maldonado was seen in the emergency department of Good Samaritan Hospital after she was involved in a vehicular accident in which the electric bicycle she was riding was struck by a car. (Tr. 583-93). Her physical examination was unremarkable aside from an abrasion on her right elbow along with a sprain of her left wrist and ankle. (Tr. 586, 588). Moreover, a CT scan of her skull disclosed no significant change in her intraventricular brain mass. (Tr. 587). In a March 24, 2020 follow-up appointment with Dr. Allen, Maldonado reported that her symptoms had improved somewhat since the accident and disclosed that she had vacationed in Florida following this injury. (Tr. 707).

In May of  2020, Maldonado saw Dr. Thomas Sherman, who prescribed a course of physical therapy for her post-accident hip and ankle pain. (Tr. 685-86, 690-91). An MRI of the left ankle revealed peroneal tenosynovitis and very mild arthritis

of the ankle joint. (Tr. 693). X-rays of the left hip revealed no fractures or malalignment and unremarkable soft tissues. (Tr. 728).

Maldonado was then seen by Dr. Allen on several occasions in June of 2020 complaining of hip pain. (Tr. 67-71, 680-81). While she exhibited a slight limp, Maldonado's physical examinations revealed that her strength, mood and affect were all normal. (Id.) Dr. Allen also noted that Maldonado "went back to work about a month ago so she is having more physical activity." (Tr. 670). A neurological follow up performed by Dr. Barbara Peterlin diagnosed Maldonado with chronic migraines, while finding that her memory was intact; her attention span and concentration were appropriate; and she exhibited normal strength. (Tr. 674-75).

A July 8, 2020, neuropsychology clinical encounter with Dr. Jon Bentz yielded similar results. (Tr. 666-67). Upon a mental status examination, Maldonado presented with an open and cooperative attitude, good eye contact, and normal speech. (Tr. 667). Her mood was "good;" her affect was full; her concentration was normal; and her thought process was coherent and goal-directed. (Tr. 667). Maldonado's cognition, fund of knowledge, and memory were all intact; her insight was fair; and her judgment was good. (Tr. 668). Dr. Bentz recommended a conservative course of treatment consisting of limiting her caffeine intake, practicing guided relaxation, exercising regularly, and attending outpatient psychotherapy and

biofeedback training. (Tr. 666-67). In fact, Maldonado attended several sessions of biofeedback training from October 2020 through February 2021. (Tr. 1061, 1068, 1074, 1080, 1087, 1094).

In July of 2020 Maldonado also treated with Dr. Matthew Torres for chronic low back pain and possible sciatica. (Tr. 658). A physical examination revealed a decreased range of motion of her left hip and tenderness of the lumbar spine. (Tr. 659-60). However, an MRI of the lumbar spine performed that month revealed no obvious foraminal stenosis, but merely disclosed some degenerative changes including disc protrusions and mild central canal stenosis. (Tr. 656, 660).

In August of 2020, Maldonado was seen by Dr. Allen, by Dr. Rodney Brenneman, an orthopedist, and by Dr. Jackson Liu, a pain management specialist. During her August 14, 2020 appointment with Dr. Allen, Maldonado reported that she was experiencing back and hip pain after she "over did it at work." (Tr. 786). Dr. Brenneman also treated Maldonado for back pain and recommended a conservative course of treatment including injections and adding lumbar exercises to her physical therapy regimen. (Tr. 804). Throughout the Fall of 2020, Maldonado continued to see a number of medical providers for her back and hip pain. (Tr. 960-79). She was advised to continue with conservative treatment of these conditions through pain management treatment, massage therapy, and chiropractic care. (Id.)

9

On November 6, 2020, Maldonado's neurosurgeon Dr. Dziurzynski conducted a follow up evaluation of her intraventricular brain meningioma. (Tr. 1031). Despite this impairment, Dr. Dziurzynski reported that Maldonado "has been able to continue working." (Id.) A physical examination revealed that Maldonado was independently ambulatory with non-focal motor deficit, and an MRI found that her meningioma was clinically and radiographically stable. (Tr. 1031).

## B. **Medical Opinion Evidence**

Aside from this mixed and equivocal clinical history which was replete with references to Maldonado's ongoing employment, the administrative record contained six medical opinions from treating, consulting, and state agency expert sources. Five of these experts, a clear medical consensus, concluded that Maldonado retained the capacity to perform some work.

On March 26, 2020, Karena Harmon, a nurse practitioner, conducted a consultative examination of Maldonado. (Tr. 639-49). In the course of this examination, Nurse Practitioner Harmon reported that Maldonado did not require the use of any assistive device. (Tr. 640). Maldonado had a normal stance and gait, and could get on and off the exam table without assistance. (Tr. 641). She could walk on her toes without difficulty and could engage in a full squat. (Id.) Her physical examination results were unremarkable, and her strength and dexterity were intact.

(Tr. 641-42). She exhibited some short-term memory difficulty, but otherwise displayed no signs of mental impairment. (Id.) Accordingly, Nurse Practitioner Harmon concluded that Maldonado retained the capacity to perform work at a medium exertional level.

On April 12, 2020, Dr. Jay Shaw, a state agency expert, also opined that Maldonado retained the capacity to work, albeit with some greater restrictions than those found by Nurse Practitioner Harmon. Specifically, Dr. Shaw concluded that Maldonado was physically capable of performing light work. (Tr. 87-90). Seven months later, on November 17, 2020, a second state agency expert, Dr. Joanna DeLeo, concurred in this assessment, finding that Maldonado could perform light work. (Tr. 119-23).

Two state agency experts also found that Maldonado could meet the mental demands of the workplace with some accommodations. Thus, on April 7, 2020, Dr. Dennis Gold founds that Maldonado's emotional impairments were not work preclusive. (Tr. 82-87, 90-91). Five months later, on September 30, 2020, a second state agency expert, Dr. Edward Jones, reached similar conclusions regarding Maldonado's ability to meet the mental demands of the workplace. (Tr. 110-19, 123-25).

In stark contrast to this medical consensus was the March 5, 2021 opinion of Dr. Allen, one of Maldonado's treating physicians. (Tr. 1098-1103). Dr. Allen opined that Maldonado had been totally disabled due to her physical and emotional impairments since July 2019. (Id.) The outlier opinion was noteworthy in several respects. First, Dr. Allen stated that Maldonado had been totally disabled since July 2019, even though the doctor's own treatment notes had documented her work activities in 2019 and 2020 on a number of occasions. In addition, some of the doctor's findings seemed internally inconsistent. For example, Dr. Allen indicated that Maldonado could stand or walk for less than two hours during a work day, but also indicated that she needed to walk every five minutes while at work, and must walk for five minutes on each of these occasions. (Tr. 1100). Thus, the doctor's report seemed to require Maldonado to either rarely walk or constantly walk at work.

## C. **Agency Proceedings and the ALJ's Decision**

It is against this factual backdrop that the ALJ conducted a hearing in this case on March 10, 2021. (Tr. 39-81). Maldonado and a Vocational Expert testified at this hearing. In her testimony, Maldonado acknowledged working as a clerk and store laborer on a full and part-time basis from July 2019 through August 2020. Maldonado also described her activities of daily living, which included light cleaning, shopping, cooking, and laundry. (Id.)

Following this hearing on May 12, 2021, the ALJ issued a decision denying Maldonado's application for benefits. (Tr. 12-33). In that decision, the ALJ first concluded that the plaintiff met the insured status requirements of the Act through December 31, 2025. (Tr. 17). The ALJ further found that Maldonado had, in fact, engaged in substantial gainful activity during at least part of this period of claimed disability, citing her full-time employment after her alleged date of onset of disability, July 1, 2019. (Tr. 17-18). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Maldonado's obesity, intraventricular meningioma, neurocognitive disorder, degenerative disc disease of the lumbar spine, arthritis of the left ankle joint, and migraine headaches were all severe impairments. (Tr. 18).  At Step 3 the ALJ determined that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 18-20).

The ALJ then concluded that Maldonado retained the following residual functional capacity (RFC):

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she is limited to frequently balancing, stooping, and crouching; to no climbing ladders, ropes or scaffolds and occasionally climbing ramps and stair, kneeling and crawling. She can tolerate no more than moderate levels of noise as defined in Appendix D of the SCO and would need to avoid work outdoors in bright sunshine and work with bright or flickering lights

such as would be experienced in welding or cutting metals. She can make simple work related decisions, can tolerate occasional changes in the work setting, and can tolerate occasional interaction with the public.

(Tr. 20).

In reaching this RFC determination the ALJ painstakingly examined Maldonado's treatment history and the medical opinion evidence. (Tr. 20-30). Thus, the ALJ documented the frequent, and frequently benign, clinical findings reported by Maldonado's care-givers. The ALJ also took into account the immutable fact that Maldonado's activities of daily living, including her employment for some thirteen months after the date of the alleged onset of her disability, suggested that the plaintiff retained the capacity to perform some work. The ALJ also assessed the medical opinion evidence in this case, finding that the medical consensus that Maldonado could perform some work was more persuasive than the extreme views voiced by a single source, Dr. Allen. However, the ALJ's decision gave Maldonado every benefit of the doubt by restricting her to a limited range of light work.

Given this RFC determination, the ALJ found that Maldonado could not perform her past work but retained the capacity to perform other jobs that existed in significant numbers in the national economy. (Tr. 32). Having reached these conclusions, the ALJ determined that the plaintiff had not met the demanding showing necessary to sustain her claim for benefits and denied this claim. (Tr. 33).

14

This appeal followed. (Doc. 1). On appeal, Maldonado advances several claims, arguing that the ALJ erred in assessing her severe and non-severe impairments, and should have followed the sole medical opinion which supported her disability claim. However, given the highly deferential standard of review which applies here, we are constrained to conclude that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, the Commissioner's decision will be affirmed.

## III.   Discussion

### A.     Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not

substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a

conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir.

1993).  But in an adequately developed factual record, substantial evidence may be

"something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence."  Consolo v. Fed. Maritime Comm'n,

383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in

this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——,
> 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. Consolidated Edison Co. v. NLRB,
> 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial
> evidence, this Court has said, is "more than a mere scintilla." Ibid.; see,
> e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks
> omitted). It means—and means only—"such relevant evidence as a
> reasonable mind might accept as adequate to support a conclusion."
> Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v.
> Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999)

16

(comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's

findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice, ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based upon alleged inadequacies in the articulation of a claimant's mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the United States Court of Appeals recently addressed the standards of articulation that

apply in this setting. In <u>Hess</u>, the court of appeals considered the question of whether an RFC, which limited a claimant to simple tasks, adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that, "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.'" <u>Hess v. Comm'r Soc. Sec.</u>, 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " <u>Hess v. Comm'r Soc. Sec.</u>, 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the <u>Hess</u> decision are straightforward. In formulating a mental RFC, the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract.

Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

### B.  Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured.  42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a).

Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at Step 2 of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL

21

1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her from engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and state that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from

22

a physician regarding the functional abilities of the claimant." Biller v. Colvin, 962

F.Supp.2d 761,778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–

2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has

been held that "[t]here is no legal requirement that a physician have made the

particular findings that an ALJ adopts in the course of determining an RFC."

Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held

in cases where there is no evidence of any credible medical opinion supporting a

claimant's allegations of disability that "the proposition that an ALJ must always

base his RFC on a medical opinion from a physician is misguided." Cummings v.

Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by

evaluation of the factual context of these decisions. Those cases which emphasize

the importance of medical opinion support for an RFC assessment typically arise

where well-supported medical sources have identified limitations supporting a

disability claim, but an ALJ has rejected such a determination based upon a lay

assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these

cases simply restate the commonplace idea that medical opinions are entitled to

careful consideration when making a disability determination, particularly when

those opinions support a finding of disability. In contrast, when no medical opinion

supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all the facts and evidence. See Titterington, 174 F. App'x 6; Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113; see also Metzger v. Berryhill, 2017 WL 1483328, at *5; Rathbun v. Berryhill, 2018 WL 1514383, at *6.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his

decision which evidence he has rejected and which he is relying on as the basis for

his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

C.    **Step Two Analysis**

Step 2 of this sequential analysis is often the first substantive benchmark an

ALJ must address and is governed by familiar legal standards:

> With respect to this threshold showing of a severe impairment, the
> showing required by law has been aptly described in the following
> terms: "In order to meet the step two severity test, an impairment need
> only cause a slight abnormality that has no more than a minimal effect
> on the ability to do basic work activities. 20 C.F.R. §§ 404.1521,
> 416.921; S.S.R. 96–3p, 85–28. The Third Circuit Court of Appeals has
> held that the step two severity inquiry is a *'de minimus* screening device
> to dispose of groundless claims.' McCrea v. Comm. of Soc. Sec.,370
> F.3d 357, 360 (3d Cir.2004); *Newell v. Comm. of Soc. Sec.,* 347 F.3d
> 541, 546 (3d Cir.2003). 'Any doubt as to whether this showing has been
> made is to be resolved in favor of the applicant.' Id*."* Velazquez v.
> Astrue, No. 07–5343, 2008 WL 4589831, *3 (E.D.Pa., Oct.15, 2008).

Dotzel v. Astrue, No. 1:12-CV-1281, 2014 WL 1612508, at *4 (M.D. Pa. Apr. 22,

2014).

However, it is also clear that:

> [E]ven if an ALJ erroneously determines at step two that
> one impairment is not "severe," the ALJ's ultimate
> decision may still be based on substantial evidence if the
> ALJ considered the effects of that impairment at steps
> three through five. However, where it appears that the
> ALJ's error at step two also influenced the ALJ's RFC
> analysis, the reviewing court may remand the matter to the
> Commissioner for further consideration. See Nosse v.

25

Astrue, No. 08–[CV–1173, 2009 WL 2986612, *10]
(W.D.Pa. Sept.17, 2009).

McClease v. Comm. of Soc. Sec., No. 8–CV–1673, 2009 WL 3497775,
*10 (E.D. Pa. Oct. 28, 2009); see also Salles v. Comm. of Soc. Sec.,
229 Fed. App'x 140, 145, n. 2 (3d Cir. 2007) (citing Rutherford v.
Barnhart, 399 F.3d 546, 553 (3d Cir. 2005) ("Because the ALJ found
in Salles's favor at Step Two, even if he had erroneously concluded that
some of her impairments were non-severe, any error was harmless.").

Stouchko v. Comm'r of Soc. Sec., No. 1:12-CV-1318, 2014 WL 888513, at

*10 (M.D. Pa. Mar. 6, 2014).

### D.   Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms

The interplay between the deferential substantive standard of review that governs Social Security appeals, and the requirement that courts carefully assess whether an ALJ has met the standards of articulation required by law, is also illustrated by those cases which consider analysis of a claimant's reported pain. When evaluating lay testimony regarding a claimant's reported degree of pain and disability, we are reminded that:

> [T]he ALJ must necessarily make certain credibility determinations, and this Court defers to the ALJ's assessment of credibility. See Diaz v. Comm'r, 577 F.3d 500, 506 (3d Cir.2009) ("In determining whether there is substantial evidence to support an administrative law judge's decision, we owe deference to his evaluation of the evidence [and] assessment of the credibility of witnesses...."). However, the ALJ must specifically identify and explain what evidence he found not credible and why he found it not credible. Adorno v. Shalala, 40 F.3d 43, 48 (3d

26

Cir.1994) (citing <u>Stewart v. Sec'y of Health, Education and Welfare</u>, 714 F.2d 287, 290 (3d Cir.1983)); <u>see also Stout v. Comm'r</u>, 454 F.3d 1050, 1054 (9th Cir.2006) (stating that an ALJ is required to provide "specific reasons for rejecting lay testimony"). An ALJ cannot reject evidence for an incorrect or unsupported reason. <u>Ray v. Astrue</u>, 649 F.Supp.2d 391, 402 (E.D.Pa.2009) (quoting <u>Mason v. Shalala</u>, 994 F.2d 1058, 1066 (3d Cir.1993)).

<u>Zirnsak v. Colvin</u>, 777 F.3d 607, 612–13 (3d Cir. 2014).

Yet, it is also clear that:

Great weight is given to a claimant's subjective testimony only when it is supported by competent medical evidence. <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 409 (3d Cir. 1979); accord <u>Snedeker v. Comm'r of Soc. Sec.</u>, 244 Fed.Appx. 470, 474 (3d Cir. 2007). An ALJ may reject a claimant's subjective testimony that is not found credible so long as there is an explanation for the rejection of the testimony. Social Security Ruling ("SSR") 96–7p; <u>Schaudeck v. Comm'r of Social Security,</u> 181 F.3d 429, 433 (3d Cir. 1999). Where an ALJ finds that there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

<u>McKean v. Colvin</u>, 150 F. Supp. 3d 406, 415–16 (M.D. Pa. 2015)(footnotes omitted). Thus, we are instructed to review an ALJ's evaluation of a claimant's subjective reports of pain under a standard of review which is deferential with respect to the ALJ's well-articulated findings, but imposes a duty of clear articulation upon the ALJ so that we may conduct meaningful review of the ALJ's conclusions.

In the same fashion that medical opinion evidence is evaluated, the Social Security Rulings and Regulations provide a framework under which the severity of a claimant's reported symptoms are to be considered. 20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p. It is important to note that though the "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled."). It is well-settled in the Third Circuit that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." Hantraft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (referring to 20 C.F.R. §404.1529). When evaluating a claimant's symptoms, the ALJ must follow a two-step process in which the ALJ resolves whether a medically determinable impairment could be the cause of the symptoms alleged by the claimant, and subsequently must evaluate the alleged symptoms in consideration of the record as a whole. SSR 16-3p.

First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR

16–3p. During the second step of this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes, but is not limited to: medical signs and laboratory findings, diagnosis and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. The Social Security Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p.

Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has

29

received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. Id.; see George v. Colvin, No. 4:13–CV–2803, 2014 WL 5449706, at *4 (M.D.Pa. Oct. 24, 2014); Koppenaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1995999, at *9 (M.D. Pa. Apr. 8, 2019), report and recommendation adopted sub nom. Koppenhaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1992130 (M.D. Pa. May 6, 2019);Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *8–9 (M.D. Pa. Sept. 30, 2015).

## E.   **Legal Benchmarks for the ALJ's Assessment of Medical Opinions**

The plaintiff filed this disability application in October of 2019, following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March 0f 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more

31

persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions " the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

It is against these benchmarks that we assess this appeal.

## F.   The Commissioner's Decision Should Be Affirmed.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence," Pierce, 487 U.S. at 565, but rather "means—

and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek, 139 S. Ct. at 1154.

Judged against these deferential standards of review, we find that the evidence supported the ALJ's decision that Maldonado was not entirely disabled, but rather could perform light work limited to simple tasks. On appeal, Maldonado challenges the sufficiency of the ALJ's analysis of this case on several scores, but we find that substantial evidence supported the ALJ's denial of this claim.

At the outset, Maldonado contends that the ALJ erred when she failed to consider Maldonado's carpel tunnel syndrome, depression, and sleep disorders to be severe impairments. However, we are constrained to note that the ALJ did consider these conditions, (Tr. 18), but the evidence supporting these diagnoses was limited, meager, and was not suggestive of a severe level of impairment. For example, with respect to Maldonado's carpel tunnel syndrome, Maldonado acknowledged that her testing for this condition had been negative. (Tr. 18, 639). Moreover, even Dr. Allen's extremely limiting medical opinion failed to identify any manipulative limitations on Maldonado's part due to this condition. (Tr. 1098-1103). Likewise, to the extent that Maldonado reported experiencing depression, that condition was thoroughly considered by the ALJ who found that her symptoms resulted in only mild to moderate degrees of impairment. (Tr. 19-20). These findings were consistent

with the limited clinical evidence and the expert psychological consensus that Maldonado retained the ability to meet the mental demands of the workplace. Moreover, the ALJ's RFC specifically took this condition into account when the ALJ confined Maldonado to work involving simple decisions and only occasional changes in the workplace. (Tr. 20). Finally, the meager evidence relating to any sleep disorder on Maldonado's part was acknowledged by the ALJ in her comprehensive evaluation of the plaintiff's medical history. (Tr. 28).

As we have noted, at step-two of this sequential analysis, the ALJ determines whether a claimant has a medically severe impairment or combination of impairments. Bowen v. Yuckert, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). An impairment is only considered severe if it significantly limits an individual's physical or mental abilities to do basic work activities. 20 C.F.R. 404.1520(c). The burden is on the claimant to show that an impairment qualifies as severe. Applying these benchmarks, we find that the ALJ's step two evaluation in this case is supported by substantial evidence. However, in any event it is evident that the ALJ also considered these impairments throughout the sequential evaluation process and incorporated them into Maldonado's RFC. This continued consideration of these emotional and physical impairments is fatal to this Step 2 argument since it is well settled that: "[E]ven if an ALJ erroneously determines at step two that one

35

impairment is not 'severe,' the ALJ's ultimate decision may still be based on substantial evidence if the ALJ considered the effects of that impairment at steps three through five." Naomi Rodriguez v. Berryhill, No. 1:18-CV-684, 2019 WL 2296582, at *10 (M.D. Pa. May 30, 2019) (citing cases). See Stancavage v. Saul, 469 F. Supp. 3d 311, 332 (M.D. Pa. 2020).

Likewise, we discern no error in the ALJ's analysis of the medical opinion evidence. In this regard,, it is clear that:

> [W]e are no longer bound by a treating source rule. Instead, it is now clear that persuasiveness is the touchstone for any medical opinion evaluation. Further, it is well settled that "supportability ... and consistency ... are the most important factors [to] consider when [ ] determine[ing] how persuasive [to] find a medical source's medical opinions ... to be." 20 C.F.R. § 404.1520c(b)(2). In this context, supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Consistency, in turn, is defined to mean that: "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1)-(2).

Sager v. Kijakazi, No. 3:21-CV-100, 2022 WL 773917, at *15 (M.D. Pa. Feb. 11, 2022), report and recommendation adopted, No. 3:21-CV-00100, 2022 WL 757237 (M.D. Pa. Mar. 11, 2022).

In this case, substantial evidence supported the ALJ's decision that the medical consensus expressed by five independent experts who found that Maldonado could work was more persuasive than the isolated, extreme opinion of Dr. Allen. On this score, this medical consensus was supported by, and consistent with, the clinical evidence, which generally described Maldonado's condition in terms that were less than disabling. These medical opinions were also consistent with, and supported by, the immutable fact that Maldonado in fact worked for some thirteen months after the claimed onset of her disability.

In contrast, these critical elements of consistency and supportability were lacking in Dr. Allen's outlier opinion, which suggested that Maldonado had been totally disabled due to her physical and emotional impairments since July 2019. (Tr. 1098-1103). For example, there was an inherent inconsistency between Dr. Allen's opinion that Maldonado had been totally disabled since July 2019 and the doctor's own treatment notes that had documented her work activities in 2019 and 2020. Likewise Dr. Allen indicated that Maldonado could stand or walk for less than two hours during a work day, but also indicated that she needed to walk every five minutes while at work, and must walk for five minutes on each of these occasions. (Tr. 1100). Thus, the doctor's report was internally inconsistent in that it seemed to require Maldonado to both rarely walk and constantly walk while at work.

37

Finally, Maldonado's general critique oof the RFC assessment in this case is also unavailing. While Maldonado invites us to discount this RFC determination, it is clear that:

> [T]he ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations. <u>Chandler</u>, 667 F.3d at 361. RFC is defined as " 'that which an individual is still able to do despite the limitations caused by his or her impairment(s).' " <u>Burnett</u>, 220 F.3d at 121 (3d Cir. 2000) (quoting <u>Hartranft v. Apfel</u>, 181 F.3d 358, 359 (3d Cir. 1999)). It reflects the *most* that an individual can still do, despite his or her limitations, and is used at steps four and five to evaluate the claimant's case. 20 C.F.R. §§ 404.1520, 404.1545; SSR 96-8P, 1996 WL 374184 at *2. In assessing the RFC, the ALJ must consider all the evidence of the record and, regardless of its source, "evaluate every medical opinion ... receive[d]." <u>Burnett</u>, 220 F.3d at 121 (internal citations omitted). The Court's "review of the ALJ's assessment of the [claimant]'s RFC is deferential," and the "RFC assessment will not be set aside if it is supported by substantial evidence." <u>Black v. Berryhill</u>, No. 16-1768, 2018 WL 4189661 at *3 (M.D. Pa. Apr. 13, 2018); <u>see also</u> <u>Martin v. Comm'r of Soc. Sec.</u>, 547 F. App'x 153, 160 (3d Cir. 2013) ("We examine the ALJ's conclusions as to a claimant's RFC with the deference required of the substantial evidence standard of review." (internal quotation marks omitted)).

<u>Stancavage</u>, 469 F. Supp. 3d at 339.

In this case substantial clinical evidence, a broad medical expert consensus, and Maldonado's own active employment history all supported the notion that the plaintiff retained the residual functional capacity to perform at least light work. Since we are obliged to sustain an ALJ's decision whether substantial evidence; that is, such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion, supports that decision, this high quantum of proof supporting the ALJ's determination of Maldonado's ability to work is fatal to this appeal.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

39

IV.    **<u>Conclusion</u>**

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

<u>*/S/ Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge

DATED: February 23, 2023